UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

ANADARKO E&P COMPANY LP,

                **Plaintiff,**

    **v.**

NORTHWOOD ENERGY CORPORATION,

                **Defendant.**

**Case No. 2:12-cv-938**
**JUDGE EDMUND A. SARGUS, JR.**
**Magistrate Judge Terence P. Kemp**

## OPINION AND ORDER

This matter is before the Court on Defendant's Motion for Judgment on the Pleadings as

to the Complaint and Partial Judgment on the Pleadings as to the Counterclaim (ECF No. 30),

and on Plaintiffs' Motion for Partial Judgment on the Pleadings as to the Counterclaim (ECF No.

24).

### I.

Defendant Northwood Energy Corporation ("Defendant or Northwood") engages in

subsurface oil and gas development in Ohio. At a time of widespread interest in acquiring oil

and gas leases in the Utica shale strata in eastern Ohio, Northwood had assembled for sale a

portfolio of nearly 34,000 acres of leases on behalf of landowners in that area. In recognition of

the significant capital requirements and specific technological expertise required to develop the

"deep rights" commonly associated with horizontal exploration for oil and gas in the Utica shale

strata, Northwood sought to enter into a relationship with another company to develop the deep

rights in the Ohio oil and gas leases.

On September 30, 2011, Northwood entered into a letter of intent agreement ("Letter of

Intent") with Plaintiff Anadarko E&P Company LP ("Plaintiff or Anadarko") for development of these deep rights in the Utica shale strata. The Letter of Intent set forth the terms on which Anadarko would acquire a 90% interest in Northwood's oil and gas leases in, *inter alia*, Coshocton, Belmont, Noble and Holmes Counties at a purchase price of $2,500 per net mineral acre. The Letter of Intent contemplated that Anadarko would perform customary and usual due diligence prior to the execution of a mutually agreeable purchase and sale agreement.

The principal terms of the agreement between Anadarko and Northwood were ultimately set forth in the contemplated purchase and sale agreement ("PSA"). The PSA is a 52-page, single spaced document, with four exhibits consisting of an additional 324 pages. (ECF No. 45-1, 45-2, 45-3, 45-4, 45-5.[1])

In advance of executing the PSA, Anadarko sought additional time to investigate whether there were title defects with respect to certain leases. To provide Anadarko with the requested time to complete its investigation, the parties agreed to establish the Closing as December 28, 2011, as defined by § 9.1 of the PSA, and the Final Closing, as defined by § 9.4(b) of the PSA, as not later than sixty days following the Closing. Because the Closing was December 28, 2011, the Final Closing could be held no later than February 26, 2012. (Counterclaim ¶ 7, ECF No. 7.)

Plaintiff Anadarko alleges that during its due diligence review, it discovered oil and gas leases that contained provisions that prohibited their assignment without the prior consent of the respective lessors, and that many such consents had not been obtained by the December 28, 2011, Closing. As a result, the parties entered two separate agreements at the Closing. (Comp. ¶ 7, ECF No.1.)

---

[1]This document is filed under seal.

2

The first agreement executed on December 28, 2011, is the PSA. Plaintiff Anadarko paid Defendant Northwood approximately 31.5 million dollars for the partial (90%) conveyance of 14,000 acres of oil and gas leases, which were listed in Exhibit A of the PSA ("Exhibit A Leases").

The second agreement entered into at the Closing is the Letter Agreement, which both parties agree is a binding contract. (Counterclaim, Ex. A; ECF No. 7-1.) The Letter Agreement dealt with oil and gas leases that may have had unresolved title issues with respect to consents to assign such interest at the Closing. These leases were identified in Exhibit A-2 ("Exhibit A-2 Leases"), which the parties "understood and agreed . . . may have existing or remaining title issues with respect to consents to assign such interest such that [Northwood] is currently attempting to resolve." (Compl. ¶ 9; Letter Agreement, at 1.) The Exhibit A-2 Leases encompassed 20,000 acres of oil and gas leases, which had an approximate value of 44.7 million dollars pursuant to the agreed-upon price in the PSA. Because the parties "reasonably believe[d]" that the title matters would be resolved on or before the Final Closing of the PSA, Northwood conveyed the Exhibit A-2 Leases to Anadarko on December 28, 2011 at the Closing, and Anadarko paid Northwood a 15% earnest money deposit of $6,707,699.78, with the remaining 85% "to be paid when the title matters were resolved." (Letter Agreement, at 2.)

The Letter Agreement provides that, notwithstanding the assignment to Anadarko of the Exhibit A-2 Leases, Anadarko reserved its rights to elect to treat any lease as defective through a specific notice provision in the PSA. The Letter Agreement also provides that if the title issues were not mutually resolved by the Final Closing, Northwood reserved the right to have the Exhibit A-2 Leases reassigned to it in exchange for return of the earnest money.

3

The Final Closing did not occur. Currently, Anadarko is in possession of the conveyed Exhibit A-2 Leases and Northwood is in possession of the 6.7 million dollar earnest money payment.

On October 12, 2012, Anadarko filed this breach of contract/declaratory judgment action, alleging that Northwood breached the Letter Agreement by demanding reconveyance of the Exhibit A-2 Leases without offering to fulfill its reciprocal obligation to return the 15% earnest money.

On November 29, 2012, Northwood filed an Answer and Counterclaim. (ECF No. 7.) In its counterclaim, Northwood alleges that the title issues were mutually resolved before the date the Final Closing was to occur, and that Anadarko breached the PSA and the Letter Agreement by refusing to perform its contractual obligation to consummate the transaction. Northwood avers that it and the landowners it represents have been damaged by Anadarko's breach because Northwood conveyed 20,000 acres of oil and gas leases in Exhibit A-2 have not been paid for, and the acres have had no potential of development during this contractual dispute.

On February 15, 2013, Anadarko filed its Motion for Partial Judgment on the Pleadings, requesting judgment only on the requested damages portion of Defendant's breach of contract counterclaim. (ECF No. 24.) On March 11, 2013, Northwood filed its Motion for Judgment on the Pleadings as to the Complaint and Partial Judgment on the Pleadings as to the Counterclaim (ECF No. 30), addressing only the liability portion of its breach of contract counterclaim. Both of these motions are ripe for review.

4

## II.

### A. Standard

The Court reviews motions made under Fed. R. Civ. P. 12(c) in the same manner it would review a motion made under Fed. R. Civ. P. 12(b)(6). *Vickers v. Fairfield Med. Ctr.*, 453 F.3d 757, 761 (6th Cir. 2006). In evaluating a complaint to determine whether it states a claim upon which relief can be granted under Rule 12(b)(6), the Court must construe it in favor of Plaintiff, accept the factual allegations contained in it as true, and determine whether the factual allegations present any plausible claim. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–5570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (clarifying the plausibility standard articulated in *Twombly*). The factual allegations of a pleading "must be enough to raise a right to relief above the speculative level . . . ." *Twombly*, 550 U.S. at 555 (citation omitted).

### B. Matters Considered as Part of the Pleadings

The parties agree that the pleadings consist of Plaintiff's Complaint (ECF. No. 1), Defendant's Answer and Counterclaim (ECF. No. 7) and the Letter Agreement attached as an exhibit (ECF No. 7-1), Plaintiff's Answer to the Counterclaim (ECF. No. 16), and the PSA (ECF No. 45-1) and all exhibits attached to it, which include the Exhibit A Leases (ECF No. 45-2), the Partial Assignment and Bill of Sale (ECF No. 45-3), the Operations & Well Carry Agreement (ECF No. 45-4), and a Model Operating Agreement (ECF No. 45-5).

The parties disagree as to whether a letter from Plaintiff Anadarko to Defendant Northwood dated April 4, 2012 ("April 4, 2012 Letter"), is appropriately considered part of the

5

pleadings. The April 4, 2012 Letter is attached as an exhibit to Defendant's Motion for Judgment on the Pleadings as to the Complaint and Partial Judgment on the Pleadings as to the Counterclaim. (ECF No. 30-1.) Plaintiff argues that it is not part of the pleadings, and therefore, this Court is not permitted to consider it in its determination of the parties' cross-motions for judgment on the pleadings. When determining whether to grant a motion for judgment on the pleadings, this Court "may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. NCAA*, 528 F.3d 426, 430 (6th Cir. 2008) (citing *Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir. 2001)).

The April 4, 2012 Letter was attached to Defendant's Motion and was quoted, but not identified specifically, in Defendant's Counterclaim. As reflected *infra* in the Court's analysis of Defendant's breach of contract counterclaim, the letter is central to that claim. Moreover, and again discussed in detail below, it is also central to Plaintiff's breach of contract claim. Indeed, Plaintiff identifies specifically the April 4, 2012 Letter and quotes directly from it in its Complaint at ¶ 13 to support the proposition that Northwood exercised its option to have the Exhibit A-2 Leases reconveyed. Consequently, the April 4, 2012 Letter is properly considered by the Court in its determination on the parties' cross motions for judgment on the pleadings.

## C. Applicable Law

Because this case is before the Court on diversity jurisdiction, Ohio law applies to the interpretation of the PSA and the Letter Agreement. *Poplar Creek Dev. Co. v. Chesapeake Appalachia*, LLC., 636 F.3d 235, 240 (6th Cir. 2011) ("A federal court sitting in diversity must

6

apply the law of the highest state court if that court has ruled on the matter in dispute; otherwise, the court may rely on case law from lower state courts."). The "Governing Law and Venue" provision contained in the PSA likewise provides that "[t]his agreement and the legal relations between the parties shall be governed by and construed in accordance with the laws of the State of Ohio without regard to principles of conflicts of laws otherwise applicable to such determinations." (PSA § 12.7.)

"To establish a breach of contract claim in Ohio, a plaintiff must prove, by a preponderance of the evidence, 'the existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff.'" *Savedoff v. Access Group, Inc.*, 524 F.3d 754, 762 (6th Cir. 2008) (citing *Jarupan v. Hanna*, 173 Ohio App. 3d 284 (Ohio Ct. App. 2007)). The interpretation of written contract terms is a matter of law for initial determination by the trial court. *Id.* at 763 (citing *Parrett v. Am. Ship Bldg. Co.*, 990 F.2d 854, 858 (6th Cir. 1993) (applying Ohio law); *Potti v. Duramed Pharmaceuticals, Inc.*, 938 F.2d 641, 647 (6th Cir. 1991) (applying Ohio law)). "'The role of courts in examining contracts is to ascertain the intent of the parties.'" *Id.* (citing *City of St. Marys v. Auglaize Cty Bd. of Commrs.*, 115 Ohio St. 3d 387 (Ohio 2007).) "'The intent of the parties is presumed to reside in the language they choose to use in their agreement.'" *Id.* (citing *Graham v. Drydock Coal Co.*, 76 Ohio St. 3d 311 (Ohio 1996)).

### III.

#### A. Defendant Northwood's Motion

Defendant Northwood moves for judgment on the pleadings as to the liability portion of its breach of contract counterclaim and on Plaintiff Anadarko's breach of contract and declaratory judgment claims.

7

In the Complaint, Anadarko alleges that Northwood breached the Letter Agreement "by refusing to perform its contractual obligation to return $6,707,699.78 in return for the reassignment of the Exhibit A-2 Leases." (Compl. ¶ 20.) Plaintiff further alleges in its declaratory action claim, that "[t]he Letter Agreement expressly conditions Defendant's right to a reassignment of the Exhibit A-2 Leases upon Defendant returning to Plaintiff the applicable proportionate share of the earnest money, as required by the Letter Agreement. . . . Plaintiff therefore seeks a declaration that Defendant is not entitled to a reassignment of the Exhibit A-2 Leases unless and until Defendant returns to Plaintiff $6,707,699.78, representing the applicable proportionate share of the earnest money that Plaintiff deposited with Defendant." *Id.* ¶¶ 23, 26.

The Letter Agreement that Anadarko contends Northwood breached is on Anadarko's letterhead, is dated December 28, 2011 (the PSA Closing date), is addressed to Northwood, and provides in its entirety:

> This Letter Agreement will serve to confirm the agreement between Northwood Energy Corporation (NEC) and Anadarko E&P Company LP (AEP) with respect to the Assets listed on Exhibit "A" to that certain Purchase and Sale Agreement (PSA) dated December 28, 2011. It is understood and agreed that Exhibit "A-2" at the time of closing will include description(s) of Assets that may have existing or remaining title issues with respect to consents to assign such interest such that NEC is currently attempting to resolve.
>
> Based upon the understanding that NEC and AEP reasonably believe that such title matters will be resolved on or before the Final Closing of the PSA, it is understood and agreed that NEC will separately deliver assignments of such Assets at Closing [*i.e.*, the date of the execution of this Letter Agreement], but that AEP shall pay to NEC a 15% earnest money deposit for such Assets at Closing, with the remainder to be paid once such title matters are resolved. Notwithstanding NEC assigning such interest to AEP, AEP does not waive its rights with respect to such interests with regards to Section 3.4 - Notice of Title Defects, Title Benefits, Section 3.5- Consents to Assignment and Preferential Rights to Purchase or **ARTICLE 8 - CONDITIONS TO CLOSING** as found in the PSA. NEC reserves its rights to have such interest reassigned, and AEP agrees to reassign such interests upon return of the applicable

proportionate share of the earnest money, in the event such title matters are not mutually resolved by the Final Closing.

If you are in agreement with the foregoing please execute both originals returning one to the attention of Scott McNamara.

Thank you,

(Letter Agreement) (emphasis in original). The Letter Agreement is signed by a representative of

Anadarko and of Northwood under the last sentence that states: "Agreed and Accepted this 28th

day of December, 2011." *Id.*

The parties agree that § 3.4 of the PSA referred to in the Letter Agreement sets forth a

procedure by which Anadarko, in advance of Final Closing, would provide "Title Defect Notice"

in order to assert a claim for breach of § 3.1 (which warrants that the leases would have

"Defensible Title"). Section 3.4 provides in relevant part:

Each Title Defect Notice shall be in writing and shall include (I) a description of the alleged Title Defect(s), (ii) the Lease affected by the Title Defect (each a "Title Defect Property"), (iii) the Allocated Value of each Title Defect Property, (iv) supporting documents reasonably necessary for Seller (as well as any title attorney or examiner hired by Seller) to verify the existence of the alleged Title Defect(s), and (v) the amount by which Purchaser reasonably believes the Allocated Value of each Title Defect Property is reduced by the alleged Title Defect(s) and the computations and information upon which Purchaser's belief is based.

Section 3.5 of the PSA, which is referred to in the Letter Agreement, provides in pertinent

part:

Seller shall notify Purchaser at least five (5) Business Days prior to Final Closing of all required third-party consents to the assignment of the Assets to Purchaser which have not been obtained and the Assets to which they pertain. In no event shall there be included in the Conveyances at Closing or Final Closing any Asset subject to a consent requirement that provides that transfer of the Asset without consent will result in a termination or other material impairment of any rights in relation to such Asset. . . . [Language relating to cases where the "Asset" is a "Contract".] In cases where the Asset subject to such a requirement is a Property

9

and the third-party consent to the sale and transfer of the Property is not obtained prior to the Final Closing Date, Purchaser may elect to treat the unsatisfied consent requirement as a Title Defect by giving Seller notice thereof in accordance with Section 3.4(a), except that such notice must be given at least one (1) Business Day prior to the Final Closing Date.

Reviewing the pleadings in the light most favorable to Anadarko and drawing all reasonable inferences in its favor, the Court finds that Anadarko has failed to allege a plausible breach of contract or declaratory judgment claim. The pleadings, and documents considered part of the pleadings, unequivocally show that Northwood did not invoke this provision, and instead, nearly one month after the date the Final Closing was to be held, demanded that the Exhibit A-2 Leases either be paid in full or reconveyed to Northwood, with no undertaking on the part of Northwood to return the earnest money. (*See* Compl. ¶ 12) ("On March 30, 2012, . . . Defendant demanded either full payment for [the Exhibit A-2 Leases] or that they be 'promptly reconveyed' to Defendant."); (*see also* Pl. Mem. in Opp. at 9–10) (Northwood demanded consummation of deal by payment in full for Exhibit A-2 Leases or offered that the leases be reassigned with no undertaking on Northwood's part to return the earnest money) (citing Compl., at ¶ ¶ 14–16). Therefore, Northwood did not seek to invoke its option to have the Exhibit A-2 Leases reassigned to it in return for the earnest money. Instead, Northwood made an offer in settlement of a dispute, which is shown more readily in the April 4, 2012 Letter reviewed below.

Moreover, Defendant could *only* invoke the provision of the Letter Agreement at issue here if the title defect issues were not mutually resolved by the Final Closing: "[Northwood] reserves its rights to have such interest reassigned, and [Anadarko] agrees to reassign such interests upon return of the applicable proportionate share of the earnest money, *in the event such title matters are not mutually resolved* by the Final Closing." (Letter Agreement, at 2) (emphasis

10

added). This issue – whether the title matters with respect to the Exhibit A-2 Leases were mutually resolved before the Final Closing date – is also the dispositive issue in Defendant's breach of contract counterclaim.

As to that issue, the Court finds that the terms of the contracts, which neither party argue are ambiguous, are dispositive. The Letter Agreement that relates to these title issues indicates that the Exhibit A-2 Leases were assigned to Anadarko at the Closing, and because they may have had title defects, Anadarko proposed and both parties agreed, that the specific notice procedure set forth in the PSA could be utilized by Anadarko in the event that it did not want to take a risk on any particular lease in the Exhibit A-2 Leases. Specifically, PSA § 3.5(a) provides that if a "third party consent to the sale and transfer of a property is not obtained prior to the Final Closing date, [Anadarko] may elect to treat the unsatisfied consent requirement as a Title Defect by giving [Northwood] notice thereof in accordance with Section 3.4(a)." Section, 3.4(a), provides that Anadarko "shall be deemed to have waived all breaches of Section 3.1 [the representation and warranty of Defensible Title] of which [Northwood] has not been given a Title Defect Notice on or before" ten days prior to the Final Closing. Consequently, the default position was that Anadarko would keep all of the conveyed Exhibit A-2 Leases.

Even lack of landowner consent would not automatically operate to exclude an Exhibit A-2 lease from the portfolio, because § 3.5(a) provides that, if landowner consent to assignment had not been obtained, Anadarko "*may* elect to treat the unsatisfied consent requirement as a Title Defect." (Emphasis added.) Otherwise, the lease stayed in the portfolio.

Anadarko disagrees with this plain language interpretation and contends that regardless of whether it ever elected to treat the leases with consent to assign issues as title defects under § 3.4

11

and § 3.5 of the PSA, the Letter Agreement establishes that Anadarko was not obligated to pay the balance of the purchase price for those leases until and unless Northwood first obtained the required consents to assign. This Court, however, disagrees.

The contract language unambiguously reflects that it was the title defect notice procedure that determined the ultimate scope of the Exhibit A-2 Lease portfolio that Anadarko would purchase, not the consents to assign that Anadarko alleges were not obtained (an allegation Northwood contests). Anadarko bargained for the opportunity to avail itself of the title defect notice procedure, but did not exercise it. Anadarko's admission in the April 4, 2012 Letter that it "missed the deadline to submit a Title Defect Notice," reflects its understanding that, as the Court finds here, the intent of the parties reflected in the contracts at issue was for the title defect notice procedure to determine the ultimate scope of the Exhibit A-2 Lease portfolio that Anadarko would purchase. In the April 4, 2012 Letter, Anadarko writes:

> [Anadarko] has been working diligently over the last several months identifying title defects in those leases on Exhibit A-2 to the PSA ("Exhibit A-2 Leases") with the understanding that the deadline for submitting the Title Defect Notice would be extended as verbally represented[2] to [Anadarko] by [Northwood]. During that time, [Anadarko] has provided workable alternative solutions for remedying those issues which have been to date rejected by [Northwood]. It has now come to our attention that [Northwood] has refused to honor their agreement to extend the deadline for submitting the Title Defect Notice under the PSA. Based on your oral representations that the deadline would be extended, AEP has missed the deadline to submit a Title Defect Notice; however, we are still considering other options. In our opinion, below are several options as to how the issues can be mutually resolved:

---

[2]Both parties agree that § 12.12 of the PSA provides that it can be amended "only by an agreement in writing executed by both Parties," and that "[n]o waiver of any right under this Agreement shall be binding unless executed in writing by the Party to be bound thereby." There is no allegation that the parties ever amended the date of the Final Closing § 3.4 or § 3.5 of the PSA. Nor does Anadarko attempt to hold Northwood to this alleged promise to extend the deadline for submitting title defect notices.

12

> . . . . the parties would agree in writing (a) to extend for a short period the time to
> submit title defects under the PSA; (b) extend the original closing date of the PSA
> in order to allow the parties to close the PSA as well as the additional leases not
> under the PSA ("non-PSA leases") and (c) obtain documentation to evidence curative
> solutions for all title defects.
>
> . . . AEP is proposing to acquire the Exhibit A-2 Leases [and the non-PSA leases)
> containing "consent" or "approval" title defects at a price of $1250.00 per net acre.
> AEP proposed this option in order for AEP to cure the title defects in those leases.
> . . .

April 4, 2012 Letter, at 1–2.

This Letter reflects Anadarko's understanding that it did not timely send notice to

Northwood that it intended to elect to treat as title defects certain Exhibit A-2 Leases that may

have remaining consent to assign issues. Therefore, under the PSA, Anadarko has waived is

right to do so and the title issues as to those leases were resolved.

Regardless of the resolution of the title issues pursuant to the PSA and Letter Agreement,

Anadarko contends that this Court must accept as true that the title matters were not resolved

because it has so alleged in the pleadings:

> Anadarko's pleadings allege that the "title matters" relating to the Exhibit A-2 Leases
> were never resolved because Northwood never obtained the requisite consents.
> Accepted as true, this allegation means that, under the clear terms of the Letter
> Agreement, Anadarko's obligation to pay the remaining 85% balance of the purchase
> price of the Exhibit A-2 Leases never came due, and that Northwood's counterclaim
> for breach of that alleged obligation therefore fails, whether or not Anadarko
> submitted any Title Defect Notice. Having failed to resolve the title matters relating
> to the Exhibit A-2 Leases by obtaining the requisite consents, Northwood's only
> contractual recourse was to accept reassignment of the leases. As Anadarko's
> pleadings allege, Northwood chose that option, which obligates it to return
> Anadarko's deposit.

(Pl. Mem. in Opp. at 16; ECF No. 38 at 19.)

However, Anadarko's allegation that the "title matters" were never resolved is a matter of

13

law for this Court to determine, not a matter of fact that must be accepted as true.  This Court, in

the context of a Rule 12(c) motion, must accept as true all well-pleaded factual allegations, but

not legal conclusions.  *See Twombly*, 550 U.S. at 555; *see also Iqbal*, 129 S.Ct. at 1949 ("[T]he

tenet that a court must accept as true all of the allegations contained in a complaint is

inapplicable to legal conclusions.").  Whether the title matters were resolved is a matter of

contract interpretation for this Court to determine.  *See Savedoff*, 524 F.3d at 763 (under Ohio

law the interpretation of written contract terms is a matter of law for initial determination by the

court).

Anadarko also argues that, under § 8.2(b) of Article 8 of the PSA, Anadarko's obligation

to "consummate the transactions contemplated by this Agreement" was expressly conditioned

upon Northwood having "performed and observed, in all material respects, all covenants and

agreements to be performed or observed by it under this Agreement prior to or on the Final

Closing Date."  Anadarko posits that, because of Northwood failed to perform in all material

respects its covenants, Anadarko was not obligated to consummate the transaction.

With regard to that argument, Anadarko asserts that Northwood failed to perform its

obligations under § 3.5 of the PSA, stating that "Anadarko was to make its Title Defect election

only *after* Northwood first provided notice *to Anadarko* of the leases for which it had not

obtained the requisite consents despite the exercise of "commercially reasonable efforts.[3]" (Pl.

---

[3]Although it has no bearing on this analysis, the Court notes that Anadarko's assertion
that Northwood was required to use commercially reasonable efforts to obtain the requisite
consents is an inaccurate statement.  All parties agree that the assets to which the requisite
consents refer are third party consents to the sale and transfer of a property.  However, § 3.5(a) of
the PSA also refers to "Contracts," which neither party suggests are at issue here.  With regard to
the Contracts, § 3.5 provides: "In cases where the Asset subject to such a requirement is a
Contract and Purchaser is assigned the Properties to which the Contract relates, but the Contract

14

Mem. in Opp. at 12–13.) The pleadings show, however, that Northwood did first provide notice to Anadarko and it did so at least five days prior to the Final Closing. The Letter Agreement indicates that the Exhibit A-2 Leases were the leases with potential consent to assign issues that Northwood was at that time, December 28, 2011, "attempting to resolve." These leases were bundled into Exhibit A-2 at the Closing. Thus, Defendant notified Plaintiff of the leases for which it had not obtained the requisite consents. This notification took place at the Closing, December 28, 2011, which is more than five days before the scheduled Final Closing date.

The next performance issue alleged by Anadarko relates to its contention that the conveyance of leases that may have consent to assign issues results in a material impairment in violation of contractual provisions, thereby relieving Anadarko of its obligation to consummate the purchase of the Exhibit A-2 Leases. Specifically, Anadarko relies on PSA § 3.5's language, which provides that "[i]n no event shall there be included in the Conveyances at Closing or Final Closing any Asset [lease] subject to a consent requirement that provides that transfer of the Asset without consent will result in a termination or other material impairment of any rights in relation to such Asset." (Pl.'s Mem. in Opp., at 10) (brackets included by Anadarko) (citing PSA § 3.5.). Similarly, Anadarko asserts that in PSA § 5.5 of Article 5, Northwood represented and warranted that the transactions contemplated by the PSA would not result in a default or give rise to a right of termination.

_____

is not transferred to Purchaser due to the unwaived consent requirement, Seller shall continue after Closing and Final Closing to use commercially reasonable efforts to obtain such consent so that such Contract can be transferred to Purchaser upon receipt of such consent." The next sentence of § 3.5 is the one upon which both parties rely, and it relates to the third party consents at issue in this case. That provision does not require that Northwood use commercially reasonable efforts to obtain the third party consents.

15

However, the Exhibit A-2 Leases *were transferred* at Closing–by contractual agreement of both parties. (*See* Letter Agreement, at 1.)  Moreover, Anadarko's attempt to renegotiate the price of the leases contained in the Exhibit A-2 portfolio reflects that Anadarko too understood that the transfer of the Exhibit A-2 Leases would not result in termination of the contract or a material impairment of any rights to the leases. (*See* April 4, 2012 Letter, at 1.)

Consequently, Anadarko's arguments that Northwood's performance failures relieved Anadarko of its obligation to consummate the transaction contemplated by the contracts at issue here is without merit.

Based on the foregoing, the Court **GRANTS** Defendant's Motion for Judgment on the Pleadings as to the Complaint and Partial Judgment on the Pleadings as to the Counterclaim.

## B. Plaintiff Anadarko's Motion

Anadarko moves to dismiss the portion of Northwood's counterclaim that seeks damages consisting of projected earnings from what Anadarko refers to as "hypothetical oil and gas wells on the mineral leases at issue." (Pl.'s Mot. for Partial J. on the Pleadings, at 1.)  Plaintiff contends that, as a matter of law, these alleged damages are not recoverable because the parties expressly agreed in their contract that Anadarko was under no obligation to drill any wells on the leases.   And, Plaintiff further argues that, even "if projected earnings from hypothetical wells on the [Exhibit A-2] Leases were somehow deemed to be legally cognizable damages for Northwood's pleaded claim of breach, then they most certainly are not direct damages, but rather consequential, special, or indirect damages, which are expressly barred by a damages limitation in the parties' purchase and sale agreement." *Id.* at 4.  Plaintiff suggests that "an early ruling on this motion" will "promote efficiency and conservation" of the parties' resources "by reducing and

16

streamlining discovery and expert work in this case." *Id.*

Initially, the Court notes that a Rule 12(c) motion tests the sufficiency of the pleadings of a claim for relief, which is not what Anadarko here seeks to accomplish. Instead, Anadarko asks the Court to determine the merits of Northwood's request for particular damages and to save discovery expense. Anadarko does not dispute that Northwood sufficiently alleged a breach of contract claim, of which damages is an element.

The Court further notes that in this Opinion and Order it has determined that Northwood is entitled to judgment as a matter of law on its breach of contract counterclaim, leaving damages as a result of the breach the only remaining issue. As to those damages, Anadarko argues that it could render them moot "tomorrow simply by paying the '85% remaining cash price' that Northwood claims is due." (Pl.'s Reply Mem., at 2.) This Court disagrees.

While the 85% remaining cash price may be all that is due, Northwood may assert other damages it contends are a result of Anadarko's breach. "Generally, a party injured by a breach of contract is entitled to his expectation interest, or 'his interest in having the benefit of his bargain by being put in as good a position as he would have been in had the contract been performed.'" *Boston v. Sealmaster Indus.*, No. E-03-040, 2004 Ohio 4278, 2004 Ohio 4278, at *17 (Ohio Ct. App. Aug. 13, 2004) (citing Restatement of the Law 2d, Contracts (1981) 102-103, § 344; *Rasnick v. Tubbs*, 126 Ohio App. 3d 431, 435, 437 (1998); *accord Decastro v. Wellston City Sch. Dist. Bd. of Educ.*, 94 Ohio St. 3d 197 (2002)).

Of course, Anadarko may attempt to demonstrate that Northwood's alleged damages are too speculative to be recovered, or that they are barred because they are not "general 'loss of bargain' damages, but instead "consequential damages, *i.e.*, foreseeable but not ordinarily

17

flowing from every breach of this sort." *Stuckey v. Online Res. Corp.*, No. 2:08-cv-1188, 2009 U.S. Dist. LEXIS 115625, at *13–14 (S.D. Ohio Dec. 11, 2009) (citing Williston on Contracts § 64:12 (4th ed.)). These issues cannot be decided upon the pleadings alone.

Accordingly, the Court **DENIES** Plaintiff's Motion for Partial Judgment on the Pleadings.

IV.

Based on the foregoing, the Court **GRANTS** Defendant's Motion for Judgment on the Pleadings as to the Complaint and Partial Judgment on the Pleadings as to the Counterclaim (ECF No. 30), and **DENIES** Plaintiffs' Motion for Partial Judgment on the Pleadings as to the Counterclaim (ECF No. 24).

**IT IS SO ORDERED.**

9-4-2013
**DATE**

EDMUND A. SARGUS, JR.
**UNITED STATES DISTRICT COURT**